LINDA D. FRIEDMAN (to be admitted pro hac vice)
SUZANNE E. BISH (to be admitted pro hac vice)
GEORGE S. ROBOT (to be admitted pro hac vice)
MATTHEW J. SINGER (to be admitted pro hac vice)
STOWELL & FRIEDMAN LTD.
303 W. Madison St., Suite 2600
Chicago, Illinois 60606
(312) 431-0888
Lfriedman@sfltd.com

PETER RUKIN (SBN 178339)
DYLAN COWART (SBN 324711)
RUKIN HYLAND & RIGGIN LLP
1939 Harrison Street, Suite 290
Oakland, CA 94612
Tel: (415) 421-1800
Fax: (415) 421-1700
prukin@rukinhyland.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHANNON ZOLLER,<br><br>      Plaintiff,<br><br>      v.<br><br>GCA ADVISORS, LLC, GCA CORPORATION,<br>ROBERT HOFEDITZ, JONATHAN JAMESON,<br>REIDAN CRUZ, AND DANIEL VEATCH,<br><br>      Defendants. | Case No. 3:19-cv-4804<br><br>**COMPLAINT**<br><br>Jury Trial Demanded |

## <u>COMPLAINT</u>

Plaintiff Shannon Zoller ("Zoller"), by and through her attorneys, hereby files this Complaint against Defendants GCA Advisors, LLC, GCA Corporation (collectively "GCA" or the "Firm"), Robert "Mac" Hofeditz, Jonathan Jameson, Reidan Cruz, and Daniel Veatch, and states as follows:

**JURISDICTION AND VENUE**

1.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343. This Court has supplemental jurisdiction over Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367.  In addition, this Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332, as the amount in controversy exceeds $75,000, Plaintiff is a citizen of Illinois, and no Defendant is a citizen of Illinois, as set forth further below.  Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in this district.

2.     On August 13, 2019, Zoller filed a complaint of discrimination with the California Department of Fair Employment & Housing ("DFEH") regarding the matters encompassed by this Complaint.  The DFEH issued Zoller a right-to-sue notice dated August 13, 2019 (attached as *Exhibit A*).

**PARTIES**

3.     Defendant GCA Advisors, LLC, is the U.S.-based subsidiary of GCA Corporation, a Japanese global investment bank publicly traded on the Tokyo Stock Exchange.  GCA provides strategic merger and acquisition, capital markets, and private funds advisory services to growth companies and market leaders.  GCA Advisors, LLC is headquartered in San Francisco, California and was previously known as GCA Savvian Corporation.  GCA Advisors, LLC employs over 80 employees in the United States and generated in excess of $60,000,000 in revenue during 2016, representing nearly 40% of all worldwide revenues of GCA.  GCA Advisors, LLC is a Delaware LLC with its principal place of business in California.  GCA Advisors, LLC is wholly owned by GCA Savvian, Inc., a Delaware corporation with its principal place of business in California. GCA Corporation is a Japanese corporation with its principal place of business in Tokyo, Japan.

4.     Defendant Hofeditz is employed by GCA as a Managing Director in GCA's Private Funds Group.  Hofeditz is a resident and citizen of California.

5.     Defendant Jameson is employed by GCA as a Managing Director in GCA's Private Funds Group.  Jameson is a resident and citizen of Connecticut.

6.      Defendant Cruz is employed by GCA as a Managing Director in GCA's Private Funds Group.  Cruz is a resident and citizen of New York.

7.      Defendant Veatch was employed by GCA as its Chief Compliance Officer, Chief Financial Officer and Managing Director from 2003 until July 2017.  Veatch is a resident and citizen of California.

8.      Plaintiff Shannon Zoller is a resident and citizen of Illinois.  She was hired by GCA as a Managing Director along with Hofeditz to form its new Private Funds Group.  During her tenure at GCA, Zoller was GCA's first and only US female Managing Director.

## FACTUAL ALLEGATIONS

9.      Zoller began her career as a corporate attorney then successfully transitioned to private equity finance after being recruited by one of her corporate contacts.  By 2008, Zoller was recruited as a Director by UBS's Private Funds Group — one of the largest global private placement agent groups in the world — and then promoted to Executive Director of the Private Funds Group.  Through her legal and private equity work, Zoller developed a stellar reputation both for her depth of knowledge of the industry and for her business skill and perseverance in matching investors with potential investment opportunities.

10.      In the first half of 2013, Zoller had been exploring a number of employment opportunities in private equity when, at the recommendation of a friend and business associate, she met with Hofeditz.

11.      Hofeditz had left his employment at Probitas Funds Group because he was frustrated at what he told Zoller was his lack of control of the business and upside potential.  In his time at Probitas, Hofeditz had forged close friendships with two of his male colleagues: Jonathan Jameson and Reidan Cruz. Messrs. Jameson and Cruz declined, however, to partner with Hofeditz to start a private funds group because they were unwilling to take the financial and career risks of building a new business.  Instead, Jameson and Cruz preferred to remain employed at established firms with guaranteed earnings. Jameson and Cruz were not willing to put in the work or take the risk necessary to build a new business.

12.      With his friends Jameson and Cruz unwilling or unable to partner with him on a

new venture, Hofeditz pursued Zoller and asked her to partner with him to build the new business.  After meetings and discussions with Hofeditz about the proposed joint venture, Zoller rejected a then pending lucrative job offer as a Managing Director and placement agent with an established firm, and agreed to join Hofeditz to start a private funds group together.

13.     Hofeditz repeatedly promised Zoller that the two would be partners.  The plan was for each to draw on their business networks and devote "sweat equity," without any immediate financial reward, to build a pipeline of business "deals" to convince an established finance company to hire them and host their private funds business venture.  They agreed Zoller would focus on business development, operations, and logistics and Hofeditz would primarily lead the search for a platform to launch their venture.

**GCA Hires Zoller and Hofeditz to Form Their Private Funds Group**

14.     Zoller and Hofeditz then refined and shopped a business plan for a new group and lined up deals.  Consistent with their plan, Zoller sourced two of the three deals while Hofeditz met with suitors, including GCA, to present Zoller and Hofeditz's successful business development and multi-year business plan.  As a result of Zoller's and Hofeditz's efforts, GCA agreed to host the joint venture.  Consistent with their status as founding partners, GCA hired both Zoller and Hofeditz as Managing Directors with what Hofeditz led Zoller to believe were identical employment contracts, with the exception of specific reimbursements that Zoller agreed would be paid to Hofeditz.

15.     Although GCA boasted then, and now, of its commitment to diversity, the truth is that the Firm has no interest in supporting women.  Zoller was hired as GCA's first and only female Managing Director, and remained the only female US Managing Director at the Firm throughout her GCA tenure.  GCA's executive and management committees were and are exclusively male.  GCA is a male-dominated organization with a fraternity-like boys' club culture that has a standard operating procedure hostile to professional women.  For example, Zoller's first meeting with GCA was held at an exclusive all-men's club that required women to enter through the back door.

16.     In recognition of the sweat equity Zoller had invested in the business prior to her

hire, and her essential role as partner and co-founder of the venture, GCA promised Zoller in her employment contract (attached as **Exhibit B**): (a) an initial annual salary for 2014 and 2015 of $250,000, to be increased to $300,000 once certain revenue goals were met (which occurred by the end of 2015); (b) profit sharing in 2014 and 2015 based on a bonus pool consisting of 45% of group profits, shared equally among all Managing Directors; (c) an equal share with other Managing Directors of 40% of group profits in 2016 and thereafter; and (d) guaranteed payments for deals originated during her employment should GCA exit the business or terminate Ms. Zoller without cause.

17.     Critically, and consistent with her pre-GCA role as co-founder of the Private Funds Group, GCA agreed (in Section 4.C of the Employment Agreement) that if GCA closed their business or if Zoller was terminated for any reason other than for cause, she would receive "revenues collected by the Company from fund formation engagements commenced during your employment that have not already been distributed to you . . ."  In other words, if GCA terminated Zoller for any reason other than for "cause," she would continue receiving revenue from the Private Funds Group after her termination.  These payments guaranteed Zoller her per capita share on an equal basis with Hofeditz and served as security for the partners' sweat equity. Plaintiff will refer to these contractually required payments as "Post-Termination Equity Payments."

18.     Looking forward to reaping the rewards of her joint venture with Hofeditz and willing to continue to invest in the business, Zoller devoted enormous time and energy to developing and securing a pipeline of substantial investment and placement opportunities that would generate an ongoing income stream for GCA.  By the end of 2014, the joint venture was poised to bring Zoller and Hofeditz substantial returns on their investments.

**Defendants Lie to Zoller and Freeze Her Out of the Business**

19.     By late 2014, as a result of Hofeditz's and Zoller's hard work, the Private Funds Group's risk of loss was substantially eliminated, and Hofeditz sought to add his friend Jameson as a third Managing Director of the Private Funds Group.  Based on Hofeditz's assurance that she would not lose salary or equity, Zoller agreed to accept Jameson as a third Managing Director.

20.     In mid-2015, Hofeditz, Jameson, and Zoller met in San Francisco.  Hofeditz and Jameson informed Zoller that Cruz was ready to join the team.  Hofeditz and Jameson told Zoller that the three existing Managing Directors would each be required to take a temporary pay cut of $50,000, but claimed that adding Cruz would allow the team to expand the business and, in the long term, increase earnings for the entire team.  Zoller relied on these representations, and that all three were taking a $50,000 pay cut as an investment in the business, and reluctantly agreed to Cruz's hiring and a reduction in her salary, viewing it as her continued investment into the business.  These representations were false.  Hofeditz and Jameson did not take a pay cut, and each was paid substantially more compensation than Zoller in 2015.

21.     Once GCA hired Cruz, the Probitas "boys band" was back together.  With a successful future in sight for the Private Funds Group, Defendants began a campaign to force Zoller out of the business and take her share of the equity and earnings.  Hofeditz was openly hostile to Zoller and attempted to discredit her work and reputation.  For example, Zoller learned that during a secret trip by Hofeditz to Chicago, he drunkenly disclosed confidential information to a prospective client and investor in a public bar.  Hofeditz boasted that he had forced Zoller to take a pay cut and that she was the only Managing Director not receiving a profit-sharing bonus.  Hofeditz described Zoller not in a professional business capacity or based on her achievements but as a woman who looked "trashy" and "slutty" and wore too much makeup.  Hofeditz even complained to the prospective client and investor about the color of Zoller's lipstick.

22.     Hofeditz openly, and increasingly, displayed his disrespect for other professional women.  Hofeditz would describe female industry professionals as sexual objects or demean them as incompetent.  He told Zoller one of her female colleagues was "hot" and looked "like a lot of fun" and asked Zoller to have her meet his group at a club in Vegas during a conference.  Hofeditz complained that Zoller was wasting her time by networking with prestigious professional women's groups and successful women in business, even though her efforts generated business and revenue.  Relying on stereotypes rather than actual experience with women business leaders, Hofeditz demeaned and belittled successful female professionals and leaders, labelling them as incompetent and incapable of making decisions.  Hofeditz regularly

spoke about women in demeaning and prototypically sexist language, including by calling Zoller and other women "too nice" and demanding they "be more aggressive."

23.     With the band of Probitas men back together, they further undermined and marginalized Zoller.  Among other things, they excluded Zoller from meetings, important information, and business and client opportunities generated from her own contacts and hard work.  While Hofeditz advocated for Zoller to "be a team player" and introduce her network and clients to the male Managing Directors, Defendants concealed from Zoller the process to bring in a new client.  Hofeditz similarly inserted himself into business Zoller developed and sought credit for her work in front of clients, or sought to give Jameson and Cruz credit for the work Zoller had done.  Hofeditz also marginalized Zoller's role by insisting he, Jameson, or Cruz, but not Zoller, cover meetings under the guise of cost savings.  Zoller later learned that Hofeditz allowed Jameson to travel a longer distance to cover a meeting Hofeditz had asked Zoller not to attend.

24.     Defendants undermined and failed to treat Zoller as an equal in other ways as well. For example, in May 2016, Hofeditz, Jameson, and Cruz interviewed and then hired a mid-level analyst for the Private Funds Group.  Although she was Managing Director and co-founder of the Private Funds Group, Zoller was excluded from the interview process and was only notified of the hiring after the fact.  Zoller had been involved in all hiring decisions for the Private Funds Group before Cruz joined the team.

**Hofeditz Terminates Zoller and Tries to Get Her to Sign Away Her Rights**

25.     Nonetheless, Zoller continued to do her job effectively, making contacts and sourcing deals that brought in substantial revenue to the Private Funds Group.  Neither Hofeditz nor anyone else at GCA raised concerns about her work performance or her contribution to the Private Funds Group's bottom line.

26.     With about a day's notice, Hofeditz asked to meet with Zoller in his hotel lobby on July 20, 2016, while in Chicago on business.  During the brief meeting, Hofeditz abruptly fired Zoller "for overhead reasons."  Hofeditz made no mention of any concerns with her work, nor could he, as Zoller had performed well by any objective measure and received positive feedback. Indeed, while it was GCA's practice to formally notify employees of any performance issues or

deficiencies, with the involvement of Human Resources, and to provide employees an opportunity to address those issues prior to taking any action regarding their employment, Zoller's termination was without notice and in disregard of her strong performance.  Equally unprecedented was that Hofeditz terminated Zoller, a Managing Director and co-founder of the Private Funds Group, in this manner.

27.     At the July 20, 2016 meeting, Hofeditz gave Zoller a severance agreement and expected her to immediately sign the agreement.  Hofeditz was stunned when Zoller left the meeting, unsigned document in hand.  The GCA severance agreement was plainly designed to deprive Zoller of her contractual and civil rights.  It provided only two months' pay at her then-reduced base compensation and required a broad general release of all possible claims against GCA, including not only claims for gender discrimination but also Zoller's contractual right to the Post-Termination Equity Payments.  Clearly, Hofeditz did not write the severance agreement himself but was aided by GCA's legal and/or Human Resources departments, neither of which gave Zoller the benefit of a discussion.  In a flagrant breach of the Employment Agreement and an obvious attempt to coerce a general release of valid legal claims, Defendants have refused to pay Zoller the compensation she is due under the explicit terms of the Employment Agreement.

**Defendants' Extortion of Zoller**

28.     After Zoller rejected Defendants' attempt to pressure her to unwittingly release her contractual rights and other legal claims, Defendants engaged in a vicious and unlawful campaign to extort Zoller and force her to sign the release documents.

29.     At the time of Zoller's termination, Defendant Daniel Veatch was the Chief Compliance Officer, Chief Financial Officer, and a Managing Director of GCA.  In this role, Veatch had fiduciary duties and was tasked with ensuring adherence to governing laws and regulations, including the rules of the Financial Industry Regulatory Authority ("FINRA"), the industry's self-regulating body.  GCA is and was at all relevant times a member of FINRA.

30.     When an employee registered with FINRA stops working for a FINRA employer, the employer is required to file with FINRA a form known as a "U5."  Among other things, that form requires the employer to state the "reason for termination" and to provide a brief explanation

of certain employee departures.  The U5 is available to all employers who are members of FINRA — essentially the entire financial industry in the United States.  Thus, as Defendants and Zoller were aware, the content of her U5 would have a dramatic impact on her future job prospects.  As Defendants knew, when a U5 indicates that an employee was terminated, particularly for job performance, it can and often does end the employee's career in the financial industry.  Firms are often reluctant to hire employees who are deemed to be poor performers and/or who are terminated by their employers.  On July 22, 2016, Veatch (who prior to this time had been on friendly terms with Zoller) sent Zoller a text message, expressing that he was "very sorry to hear the news" that she had been terminated.  This began a text exchange and series of voicemails that extended well into August.

31.     Although the tone of Veatch's first few text messages was empathetic and consistent with their friendship, Veatch's messages took a darker turn within days.

32.     By July 28, 2016, Defendants and Veatch had launched a campaign to threaten and intimidate Zoller into signing the General Release.

33.     On July 28, 2016, Veatch wrote:  "As your friend, I recommend signing your Severance Agreement.  If you sign it then I will log your U5 as a voluntary resignation."  Veatch explained: "a Voluntary Resignation is a perfectly clean U5."  Veatch further shared his view of the negative and dire consequences of not following his advice:  "Anything other than a Voluntary Resignation is a black mark on your record that never goes away."

34.     Veatch concluded the day's discussion on the topic by making crystal clear Defendants' proposed quid pro quo:  a clean, though inaccurate, U5 in exchange for a general release of all claims:  "[I]f you sign your Severance Agreement, I'll file it as a Voluntary Resignation."

35.     On August 2, 2016, Veatch continued the U5 discussion, asking Zoller, "Have you/will you sign your Severance Agreement?"  Plaintiff responded that her energies were focused on finding employment.

36.     On August 10, 2016, Veatch texted, "I need to file your U5, but I need to understand what you're doing."

37.     Veatch asked again on August 13, 2016, and Zoller replied that she was not yet signing the Severance Agreement but wanted to get her U5 for job search purposes.  Veatch admitted that "[t]he two are tied together.  I would love to file a clean U5, but I cannot if that agreement is not signed."

38.     On August 17, 2016, Veatch resumed his threats:  "1. If you sign your Severance Agreement, I'll push it through (even though it's expired) and file your U5 as a voluntary resignation.  2. If you don't sign that agreement then I'll need to file your U5 a[s] Discharged.  I don't think you want this on your permanent record."

39.     On August 18, 2016, Zoller replied, "I think you should write down what I was told and check the box 'other.'"

40.     Veatch denied her request on August 19, 2016, stating "that's not an option and I need to file your U5 today.  It will be either 'Voluntary' (if you sign the agreement) or 'Discharged.'  If I don't hear from you by noon, it will be the latter."

41.     Veatch was lying when he wrote that it was "not an option" to file a U5 listing the "reason for termination" as "other" and writing down that Plaintiff was terminated for "overhead."

42.     Zoller replied: "I'm not signing the agreement.  What you're threatening to do is not what I was told by [Hofeditz] and is false.  And in doing so, as you've said, will further harm my 'permanent record.'  I trust you will do what is right."  Zoller also made it clear that even Hofeditz's stated reason of overhead was not the true reason and advised that she would explain to Veatch at a later date the reason she was terminated.

43.     Defendants filed Plaintiff's U5 later that day with the termination status of "discharged" and with the false explanation that Zoller "[d]id not meet the expectations of the role."  Defendants understood that, based on the common understanding in the financial industry, other firms would understand the false statement that Zoller "[d]id not meet the expectations of the role" as meaning that Zoller did not meet her financial goals or bring in sufficient revenue or, worse, had engaged in wrongdoing.  Defendants knew that the statement that Zoller "did not meet the expectations of the role" was false.  Defendants knew their threat to ruin Zoller's career if she

did not sign the release, which Defendants then carried out, was not only unlawful but also violated FINRA and SEC regulations.

**Plaintiff Suffered Substantial Harm Due to Defendants' Unlawful Conduct**

44.     In the wake of Zoller's termination, GCA, Hofeditz, Jameson, and Cruz have continued to profit from the business that Zoller sourced for the firm through her contacts, skills, and sacrifice, and the resulting track record of GCA's Private Funds Group, which they continue to market to win new business.

45.     In addition to paying themselves higher base salaries than Zoller's (fraudulently reduced) salary, Hofeditz, Jameson, and Cruz have also paid themselves lavish bonuses after her departure, which were inflated because they did not have to share profits with the woman who took the risk and put in the effort to build their business from scratch.  In addition, GCA, Hofeditz, Jameson, and Cruz have pocketed the Post-Termination Equity Payments that they indisputably owe Zoller under her Employment Agreement.

46.     While Defendants have continued to profit from Zoller's investment and work, including the business and goodwill she developed for GCA, Zoller's career has been irreparably damaged.  As a result of her unlawful termination and Defendants' false and defamatory U5, Zoller has been unable to obtain comparable employment since GCA terminated her.  In addition, she has not received the Post-Termination Equity Payments she is contractually owed.  Further, the Private Funds Group's revenues continue to increase, in many cases based on deals that she sourced and relationships she developed, but Zoller has been denied the benefits of the venture she and Hofeditz built.

47.     As a result of Defendants' unlawful conduct, Zoller has lost substantial income, suffered emotional distress, and her career and reputation have been irreparably harmed, among other losses.

48.     Defendants' unlawful conduct was intentional and in blatant disregard of Zoller's legal and civil rights and warrants imposition of liquidated and punitive damages.

49.     Before Zoller filed suit, the parties entered into a standstill agreement tolling the relevant statutes of limitations. As a result, Plaintiff's claims are timely filed.

## COUNT I

## FEDERAL EQUAL PAY ACT

### (Against GCA)

50.     Plaintiff realleges each and every paragraph above and incorporates them by reference as though fully stated herein.

51.     The Equal Pay Act of the Fair Labor Standards Act, 29 U.S.C. §§ 206 and 207, makes it unlawful for an employer on the basis of sex to pay lower wages or fringe benefits to employees of one sex than it does to similarly situated employees of the other sex.

52.     As described above, Plaintiff was paid lower wages than male employees in substantially equal jobs and in the same job as Managing Director, even though Plaintiff performed the same or similar duties requiring the same skill, effort, and responsibility as male employees.

53.     The differential in pay between sexes was not pursuant to seniority, merit, quantity, or quality of production, but was due to sex.

54.     Defendants intentionally paid Plaintiff less than they paid male employees who were performing substantially equal work.

55.     By their conduct as alleged herein, Defendants discriminated against Plaintiff based on her sex with respect to her wages in violation of the Equal Pay Act, 29 U.S.C. § 206(d)(1).

56.     As a result of Defendants' violation of the Equal Pay Act, Defendants should be ordered to provide Plaintiff all available legal and equitable relief, including paying Plaintiff the difference in wages between Plaintiff and her male colleagues, as well as an additional, equal amount in liquidated damages.  29 U.S.C. § 216(b).

## COUNT II

## CALIFORNIA FAIR PAY ACT – LABOR CODE SECTION 1197.5

### (Against GCA)

57.     Plaintiff realleges each and every paragraph above and incorporates them by reference as though fully stated herein.

58.     Under the California Fair Pay Act no employer may pay any employee at wage rates less than the rates paid to employees of the opposite sex for substantially similar work, when viewed as a composite of skill, effort, and responsibility, and which are performed under similar working conditions.  California Labor Code § 1197.5.

59.     As described above, Plaintiff was paid at a lower wage rate than male Managing Directors for the same or similar work.  The differential in pay between sexes was not pursuant to seniority, merit, quantity, or quality of production, but was due to sex.

60.     As a result of Defendants' violation of the California Equal Pay Act and Fair Pay Act, Defendants should be ordered to provide Plaintiff all available legal and equitable relief, including paying Plaintiff the difference in wages between Plaintiff and her male colleagues, as well as an additional, equal amount in liquidated damages.  California Labor Code § 1197.5(c). Attorneys' fees should also be awarded pursuant to California Labor Code § 1197.5(h).

## COUNT III

## SEX DISCRIMINATION – FEHA

### (Against GCA)

61.     Plaintiff realleges each and every paragraph above and incorporates them by reference as though fully stated herein.

62.     California Government Code Section 12940(a) makes it an unlawful employment practice for an employer to discriminate against a person "in compensation or in terms, conditions, or privileges of employment" . . . "because of sex."

63.     As set forth above, GCA paid Plaintiff lower wages than male employees due to her sex, terminated her employment, refused to pay her Post-Termination Equity Payments because they demanded a General Release of discrimination claims, submitted a False Form U5 and otherwise discriminated against her in the terms and conditions of her employment due to her sex.  In doing so, GCA engaged in unlawful discrimination in violation of Government Code Section 12940(a).

64.     As a direct, foreseeable and proximate result of Defendant's conduct, Plaintiff has incurred and will continue to incur damages in an amount to be proven at trial.

65.     The actions alleged herein were done with malice, fraud, and oppression, and in reckless disregard of Plaintiff's rights.  Plaintiff is thus entitled to recover punitive damages from Defendants.

## COUNT IV

## BREACH OF CONTRACT

### (Against GCA)

66.     Plaintiff realleges each and every paragraph above and incorporates them by reference as though fully stated herein.

67.     Plaintiff and GCA entered into the Employment Agreement.

68.     Plaintiff fully performed under the Employment Agreement.

69.     Paragraph 4.C of the Employment Agreement requires that if GCA terminates Plaintiff "other than for Cause," that GCA pay her the Post-Termination Equity Payments based on a formula set forth in the Employment Agreement.

70.     GCA terminated Plaintiff "other than for Cause."

71.     All conditions precedent to the payment of the Post-Termination Equity Payments have been satisfied.

72.     GCA has breached the Employment Agreement by refusing to pay Plaintiff any of the Post-Termination Equity Payments she is owed.

73.     By engaging in the conduct described above, GCA breached the Employment Agreement, causing Plaintiff substantial harm.

## COUNT V

## FAILURE TO PAY WAGES – LABOR CODE SECTION 200, *et seq*.

### (Against GCA)

74.     Plaintiff realleges each and every paragraph above and incorporates them by reference as though fully stated herein.

75.     California Labor Code § 200 defines wages to "include[] all amounts for labor performed by employees of every description, whether the amount is fixed or ascertained by the standard of time, task, piece, commission basis, or other method of calculation."

76. Paragraph 4.C of the Employment Agreement requires that if GCA terminates Plaintiff "other than for Cause", that GCA pay her the Post-Termination Equity Payments based on a formula set forth in the Employment Agreement. Those Post-Termination Equity Payments are wages.

77. Despite the Employment Agreement, Defendants have failed to pay Plaintiff any of the Post-Termination Equity Payments she is owed.

78. As a result of Defendants' failure to pay Plaintiff her owed wages, Plaintiff has suffered and will suffer damages in an amount to be proven at trial, including compensatory and punitive damages, and seeks damages in the form of unpaid wages and civil penalties including interest pursuant to California Labor Code § 218.6, as well as attorneys' fees and costs pursuant to California Labor Code § 218.5.

## COUNT VI

## WAITING TIME PENALTIES – LABOR CODE SECTION 203

### (Against GCA and Veatch)

79. Plaintiff realleges each and every paragraph above and incorporates them by reference as though fully stated herein.

80. California Labor Code § 201 provides that an employer is required to provide an employee who is terminated all accrued wages and compensation at the time of termination. Under California Labor Code § 203, if an employer willfully fails to pay such wages, for every day that final wages or any part of the final wages remain unpaid, the employer is liable for a penalty equivalent to the employee's daily wage, for a maximum of 30 days.

81. Plaintiff was and is owed Post-Termination Equity Payments that Defendants are contractually required to pay. Defendants have willfully refused to pay the Post-Termination Equity Payments despite having no legitimate grounds for their refusal.

82. As a direct and proximate result of Defendants' willful conduct in failing to pay Plaintiff all wages owed, Plaintiff is entitled to recover "waiting time" penalties of up to thirty (30) days' wages pursuant to California Labor Code § 203, in an amount to be established at trial, together, with interest thereon, and attorneys' fees and costs.

83.     Veatch is also liable for violations of California Labor Code § 203 because he qualifies as an "other person acting on behalf of an employer" pursuant to California Labor Code § 558.1 as he was an officer, director, and managing agent of GCA.

## COUNT VII

## BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

### (Against All Defendants)

84.     Plaintiff realleges each and every paragraph above and incorporates them by reference as though fully stated herein.

85.     Every contract, including the Employment Agreement, contains an implied covenant of good faith and fair dealing, imposing a duty of good faith on both parties such that neither party will damage the right of the other to receive the mutual benefits of the agreement.

86.     Moreover, Plaintiff and Defendants Hofeditz and GCA entered into a partnership or joint venture, in that they intended to share in the profits, losses and the management and control of Private Funds Group.  Members of a partnership or joint venture are required to carry out the enterprise with the highest good faith toward each other.

87.     Plaintiff acted in accordance with her contracts, agreements, and duties at all relevant times.

88.     Through the conduct described herein, including among other things:  lying to Plaintiff about the necessity of bringing on four Managing Directors; lying to Plaintiff to induce her to take a unilateral pay cut; freezing Plaintiff out of key decisions relating to the management of the business; terminating Plaintiff based on a ridiculous pretext; appropriating for themselves the relationships and opportunities Plaintiff had brought into the partnership; appropriating for themselves the revenue, bonuses, profit sharing, and Post-Termination Equity Payments that Plaintiff was entitled to; attempting to extort Plaintiff to give up her rights; and defaming her name in the marketplace to destroy her career, Defendants violated their duty of good faith and fair dealing.

89.     By engaging in the conduct described above and otherwise failing to perform their agreed-upon obligations, Defendants breached their duty of good faith and fair dealing, causing

1   Plaintiff substantial harm.

2       90.    The actions alleged herein were done with malice, fraud, and oppression, and in

3   reckless disregard of Plaintiff's rights.  Plaintiff is thus entitled to recover punitive damages from

4   Defendants.

5   ## COUNT VIII

6   ## COMMON COUNTS—QUANTUM MERUIT / UNJUST ENRICHMENT

7   **(Against All Defendants)**

8       91.    Plaintiff realleges each and every paragraph above and incorporates them by

9   reference as though fully stated herein.

10      92.    Throughout her tenure at GCA, Plaintiff performed in good faith.  She leveraged

11  her effort, skills, and contacts to put together a strong pipeline of business and build a track record

12  for future revenue and success.

13      93.    Plaintiff gave her full effort and provided benefits to Defendants, based on the

14  reasonable expectation that she would be fully compensated for her services to Defendants, as an

15  original partner and founder of the venture who took the necessary risks and was entitled to share

16  in the rewards.

17      94.    Defendants accepted Plaintiff's services, and derived great benefit from these

18  services.  Defendants have and continue to benefit from Plaintiff's efforts, and, in particular,

19  continue to receive revenue from contacts and deals she brought into the Firm and the business

20  she was instrumental in building.

21      95.    Defendants have unjustly retained the benefits and full value of Plaintiff's efforts.

22  In the circumstances described above, Defendants should be ordered to disgorge to Plaintiff the

23  benefits they have unjustly retained.

24  ## COUNT IX

25  ## PROMISSORY ESTOPPEL AND DETRIMENTAL RELIANCE

26  **(Against All Defendants)**

27      96.    Plaintiff realleges each and every paragraph above and incorporates them by

28  reference as though fully stated herein.

97.    As described above, Defendants clearly promised Plaintiff that she would be a partner at Private Funds Group and share in the profit and growth of Private Funds Group.

98.    Defendants reasonably should have expected to induce action of a definite and substantial character on the part of Plaintiff in reliance on such promises and agreements.

99.    Plaintiff reasonably and foreseeably relied on the promises of Defendants.  She expended her full effort and leveraged her skills and contacts to put together a strong pipeline of potential deals and to bring revenue into the firm.  She turned down a pending lucrative job offer as a Managing Director with an established firm. She did so in reasonable reliance on promises that she was a full partner in the venture and would be entitled to share fully in the profits generated by Private Funds Group.

100.    As a result of Defendants' conduct described above, Plaintiff suffered substantial harm.

## COUNT X

## INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

### (Against All Defendants)

101.    Plaintiff realleges each and every paragraph above and incorporates them by reference as though fully stated herein.

102.    Defendants knew that, after they terminated Plaintiff's employment, that she was unlikely to obtain lucrative employment from another employer in the financial industry.

103.    Defendants intentionally defamed Plaintiff by issuing a U5 stating, falsely, that she was "terminated" because she "did not meet the expectations of the role."  Defendants issued that U5 to disrupt the potential relationship between Plaintiff and potential future employers in the financial industry.

104.    Defendants successfully interfered in the potential relationship, in that Plaintiff has had difficulty finding comparable work in the financial industry as a result of the false and defamatory U5.

105.    Plaintiff has suffered economic harm as a result of having difficulty finding comparable work in the financial industry.

106.   Punitive damages are warranted because Defendant's actions were willful, reprehensible, fraudulent, and in blatant violation of law or public policy.

## COUNT XI

### CIVIL EXTORTION

**(Against Veatch, Hofeditz, and GCA)**

107.   Plaintiff realleges each and every paragraph above and incorporates them by reference as though fully stated herein.

108.   Defendants attempted to obtain property or other consideration — specifically, a release of Plaintiff's legal claims and forfeiture of compensation Defendants owed Plaintiff — through a wrongful use of force or fear.

109.   Specifically, Defendants threatened to knowingly make misrepresentations to FINRA, in violation of FINRA and SEC regulations, and issue a false U5 if Plaintiff refused to release her legal claims and her contractual right to Post-Termination Equity Payments.

110.   Defendants followed through on their extortionate threat to file a false U5 in violation of FINRA and SEC regulations.  As a result, Plaintiff has suffered substantial harm.

111.   Punitive damages are warranted because Defendant's actions were willful, reprehensible, fraudulent, and in blatant violation of law or public policy.

## COUNT XII

### LIBEL

**(Against GCA, Veatch, and Hofeditz)**

112.   Plaintiff realleges each and every paragraph above and incorporates them by reference as though fully stated herein.

113.   Defendant GCA is a member of FINRA.  Members of FINRA are subject to oversight and self-regulatory requirements including the requirement of disclosing information on Form U5.

114.   During the meeting between Plaintiff and Hofeditz on July 20, 2016, Hofeditz informed her that she was being terminated due to "overhead reasons" and handed her a severance agreement.

115.    Once Plaintiff refused to sign the agreement, Defendants threatened to ruin Plaintiff's reputation by submitting a false U5.

116.    Defendants intentionally and falsely reported Plaintiff's U5 to read that Complainant was terminated because she "[d]id not meet the expectations of the role." Defendants knew that such allegations were false at the time they made them.

117.    The materially false allegation included in Plaintiff's Form U5 was made by Defendants knowing that it would be repeatedly published and conveyed to each and every prospective employer of Plaintiff within the financial industry and that it would interfere with or preclude her future gainful employment in the financial industry.

118.    Defendants' false and malicious allegation against Plaintiff, made with knowledge that such false allegations would be repeatedly published to prospective employers of Plaintiff, was not subject to any privilege.

119.    By reason of the foregoing, Plaintiff has suffered substantial harm.

120.    Punitive damages are warranted because Defendants' actions were willful, reprehensible, fraudulent, and in blatant violation of law or public policy.

## COUNT XIII

## UNFAIR COMPETITION LAW – BUSINESS AND PROFESSIONS CODE § 17200, *et seq.*

### (Against GCA)

121.    Plaintiff realleges each and every paragraph above and incorporates them by reference as though fully stated herein.

122.    GCA is a "person" as defined under California Business & Professions Code § 7021.

123.    GCA's willful failure to pay Plaintiff the Post-Termination Equity Payments due to her under the Employment Agreement constitutes unlawful and/or unfair and/or fraudulent activity prohibited by California Business & Professions Code § 17200.

124.    Likewise, GCA's willful failure to pay Plaintiff the same as similarly-situated male employees constitutes unlawful and/or unfair and/or fraudulent activity prohibited by California Business & Professions Code § 17200.

125.     Likewise, GCA's conduct as alleged herein (including acts of extortion, discrimination, and non-payment of wages) constitutes unlawful, unfair and fraudulent conduct within the meaning of the UCL.

126.     Accordingly, Plaintiff is entitled to restitution with interest and other equitable relief, as well as attorneys' fees and costs pursuant to California Code of Civil Procedure § 1021.5 and California Labor Code § 218.5.

<u>COUNT XIV</u>

<u>FRAUD</u>

**(Against GCA, Hofeditz, Jameson)**

127.     Plaintiff realleges each and every paragraph above and incorporates them by reference as though fully stated herein.

128.     Defendants Hofeditz and Jameson — on behalf of GCA — knowingly and falsely represented to Zoller that, to facilitate Cruz's hire, the three existing Managing Directors would each be required to take a temporary pay cut of $50,000.  In reality, and as Defendants knew, the male Managing Directors had not and would not take a pay cut.  Defendants made this false representation to induce Zoller to take a pay cut, allowing the male Managing Directors to retain more money at Zoller's expense.

129.     Zoller reasonably relied on Defendants' false representations in acquiescing to a pay cut under false pretenses and suffered substantial harm as a result.

130.     Punitive damages are warranted because Defendant's actions were willful, reprehensible, fraudulent, and in blatant violation of law or public policy.

<u>COUNT XV</u>

<u>CONSPIRACY TO VIOLATE CIVIL RIGHTS, 42 U.S.C. § 1985(3)</u>

**(Against Hofeditz, Jameson, Cruz, and Veatch)**

131.     Plaintiff realleges each and every paragraph above and incorporates them by reference as though fully stated herein.

132.     Defendants Hofeditz, Jameson, Cruz, and Veatch entered into a conspiracy to deprive Plaintiff of her right to equal protection under the laws, including the Equal Pay Act.

133.    In entering into this conspiracy, Defendants Hofeditz, Jameson, Cruz, and Veatch were motivated by discriminatory animus against women.  They targeted Plaintiff for mistreatment because of her sex.

134.    Defendants committed numerous acts in furtherance of this conspiracy, including: lying to Plaintiff about the necessity of bringing on four Managing Directors; lying to Plaintiff to induce her to take a unilateral pay cut; freezing Plaintiff out of key decisions relating to the management of the business; terminating Plaintiff based on a ridiculous pretext; appropriating for themselves the relationships and opportunities Plaintiff had brought into the partnership; appropriating for themselves the revenue, bonuses, profit sharing, and Post-Termination Equity Payments that Plaintiff was entitled to; attempting to extort Plaintiff to give up her contractual and civil rights; and defaming her name in the marketplace to destroy her career.

135.    By reason of the foregoing, Plaintiff has suffered substantial harm.

136.    Punitive damages are warranted because Defendants' actions were willful, reprehensible, fraudulent, and in blatant violation of law or public policy.

## COUNT XVI

## FAILURE TO PREVENT CONSPIRACY TO VIOLATE CIVIL RIGHTS,

## 42 U.S.C. § 1986

### (Against GCA)

137.    Plaintiff realleges each and every paragraph above and incorporates them by reference as though fully stated herein.

138.    Defendant was aware of the conspiracy described in Count XV.

139.    Defendant had the power to prevent or aid in preventing of the wrongs perpetrated by the conspiracy, including by ensuring that Plaintiff did not receive less compensation than male Managing Directors, by preventing the unjustified termination of Plaintiff (GCA's first and only female Managing Director at the time), by preventing the attempt to extort an unlawful release from Plaintiff, by refusing to issue to FINRA a false and defamatory U5, and by paying Plaintiff the contractual Post-Termination Equity Payments she indisputably was due.

140.    However, Defendant neglected or refused to prevent the wrongs perpetrated by the

conspiracy. Instead, through its human resources and legal departments, it aided the conspirators, including, for example, by assisting in Zoller's termination and preparing a severance agreement designed to deprive Zoller of her contractual and civil rights.

141.    By reason of the foregoing, Plaintiff has suffered substantial harm.

142.    Punitive damages are warranted because Defendant's actions were willful, reprehensible, fraudulent, and in blatant violation of law or public policy.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests that this Court find against Defendants and for Plaintiff in a judgment as follows:

1.   Declare that Defendants' acts, conduct, policies and practices are unlawful;

2.   Enjoin Defendants from further discrimination and unlawful conduct and reinstate Plaintiff to her position;

3.   Expunge Plaintiff's false and defamatory U5;

4.   Award Plaintiff lost wages, compensation and benefits in an amount to be proven at trial and that make Plaintiff whole;

5.   Award Plaintiff compensatory damages, liquidated damages, and exemplary damages;

6.   Award Plaintiff damages for non-monetary harm she has suffered, including but not limited to emotional distress;

7.   Award Plaintiff punitive damages;

8.   Award Plaintiff prejudgment interest, costs, and disbursements, as provided by law;

9.   Award Plaintiff reasonable attorney's fees and costs of litigation; and

10. Award Plaintiff all other legal and equitable relief the Court deems just and proper.

1

### DEMAND FOR A JURY TRIAL

2          Plaintiff hereby demands a jury trial as provided by Rule 38(a) of the Federal Rules of

3    Civil Procedure.

4

5                                            Respectfully submitted,

6                                            STOWELL & FRIEDMAN, LTD.

7                                            By: _/s/ Linda D. Friedman_____
                                                 Linda D. Friedman
8                                                **STOWELL & FRIEDMAN LTD.**
                                                 303 W. Madison St., Suite 2600
9                                                Chicago, Illinois 60606
                                                 Phone: (312) 431-0888
10                                               Lfriedman@sfltd.com

11

12                                           RUKIN HYLAND & RIGGIN LLP

13                                           By: _/s/ Peter Rukin_____
                                                 Peter Rukin
14                                               **RUKIN HYLAND & RIGGIN LLP**
                                                 1939 Harrison Street, Suite 290
15                                               Oakland, CA 94612
                                                 Tel: (415) 421-1800
16                                               prukin@rukinhyland.com

17                                               Attorneys for Plaintiff

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A



STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency                                                                    GAVIN NEWSOM, GOVERNOR

## DEPARTMENT OF FAIR EMPLOYMENT & HOUSING

KEVIN KISH, DIRECTOR

2218 Kausen Drive, Suite 100 I Elk Grove I CA I 95758
(800) 884-1684 (Voice) I (800) 700-2320 (TTY) | California's Relay Service at 711
http://www.dfeh.ca.gov I Email: contact.center@dfeh.ca.gov

August 13, 2019

Dylan Cowart
1939 HARRISON ST STE 290
Oakland, California 94612-4713

RE:     **Notice to Complainant's Attorney**
        DFEH Matter Number: 201908-07199813
        Right to Sue: Zoller / GCA Corporation et al.

Dear Dylan Cowart:

Attached is a copy of your complaint of discrimination filed with the Department of Fair
Employment and Housing (DFEH) pursuant to the California Fair Employment and
Housing Act, Government Code section 12900 et seq. Also attached is a copy of your
Notice of Case Closure and Right to Sue.

**Pursuant to Government Code section 12962, DFEH will not serve these
documents on the employer.** You must serve the complaint separately, to all named
respondents. Please refer to the attached Notice of Case Closure and Right to Sue for
information regarding filing a private lawsuit in the State of California. A courtesy "Notice
of Filing of Discrimination Complaint" is attached for your convenience.

Be advised that the DFEH does not review or edit the complaint form to ensure that it
meets procedural or statutory requirements.

Sincerely,


Department of Fair Employment and Housing



STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency                                                              GAVIN NEWSOM, GOVERNOR

**DEPARTMENT OF FAIR EMPLOYMENT & HOUSING**                          KEVIN KISH, DIRECTOR

2218 Kausen Drive, Suite 100 I Elk Grove I CA I 95758
(800) 884-1684 (Voice) I (800) 700-2320 (TTY) | California's Relay Service at 711
http://www.dfeh.ca.gov I Email: contact.center@dfeh.ca.gov

August 13, 2019

RE:     **Notice of Filing of Discrimination Complaint**
        DFEH Matter Number: 201908-07199813
        Right to Sue: Zoller / GCA Corporation et al.

To All Respondent(s):

Enclosed is a copy of a complaint of discrimination that has been filed with the
Department of Fair Employment and Housing (DFEH) in accordance with Government
Code section 12960. This constitutes service of the complaint pursuant to Government
Code section 12962. The complainant has requested an authorization to file a lawsuit.
This case is not being investigated by DFEH and is being closed immediately. A copy of
the Notice of Case Closure and Right to Sue is enclosed for your records.

Please refer to the attached complaint for a list of all respondent(s) and their contact
information.

No response to DFEH is requested or required.

Sincerely,


Department of Fair Employment and Housing



STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency                                                                                   GAVIN NEWSOM, GOVERNOR

**DEPARTMENT OF FAIR EMPLOYMENT & HOUSING**                                    KEVIN KISH, DIRECTOR

2218 Kausen Drive, Suite 100 I Elk Grove I CA I 95758
(800) 884-1684 (Voice) I (800) 700-2320 (TTY) | California's Relay Service at 711
http://www.dfeh.ca.gov I Email: contact.center@dfeh.ca.gov

August 13, 2019

Shannon Zoller

REDACTED

RE:     **Notice of Case Closure and Right to Sue**
        DFEH Matter Number: 201908-07199813
        Right to Sue: Zoller / GCA Corporation et al.

Dear Shannon Zoller,

This letter informs you that the above-referenced complaint was filed with the
Department of Fair Employment and Housing (DFEH) has been closed effective August
13, 2019 because an immediate Right to Sue notice was requested. DFEH will take no
further action on the complaint.

This letter is also your Right to Sue notice. According to Government Code section
12965, subdivision (b), a civil action may be brought under the provisions of the Fair
Employment and Housing Act against the person, employer, labor organization or
employment agency named in the above-referenced complaint. The civil action must be
filed within one year from the date of this letter.

To obtain a federal Right to Sue notice, you must contact the U.S. Equal Employment
Opportunity Commission (EEOC) to file a complaint within 30 days of receipt of this
DFEH Notice of Case Closure or within 300 days of the alleged discriminatory act,
whichever is earlier.

Sincerely,


Department of Fair Employment and Housing

**COMPLAINT OF EMPLOYMENT DISCRIMINATION
BEFORE THE STATE OF CALIFORNIA
DEPARTMENT OF FAIR EMPLOYMENT AND HOUSING
Under the California Fair Employment and Housing Act
(Gov. Code, § 12900 et seq.)**

**In the Matter of the Complaint of**

Shannon Zoller                                     DFEH No. 201908-07199813

                           Complainant,

vs.

GCA Corporation
,

GCA Advisors, LLC
One Maritime Plaza
San Francisco, California 94111

Daniel Vaetch
,

Reidan Cruz
,

Jonathan Jameson
,

Robert Hofeditz
,

                       Respondents

_____

1. Respondent **GCA Corporation**  is an **employer** subject to suit under the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.).

2. Complainant **Shannon Zoller**, resides in the City of **Chicago** State of **Illinois.**

3. Complainant alleges that on or about **August 13, 2019**, respondent took the following adverse actions:

Date Filed: August 13, 2019

**Complainant was discriminated against** because of complainant's sex/gender, sexual harassment- hostile environment and as a result of the discrimination was terminated, denied equal pay, denied any employment benefit or privilege, denied work opportunities or assignments.

**Additional Complaint Details:** Defendant GCA Advisors, LLC, is the U.S.-based subsidiary of GCA Corporation, a Japanese global investment bank publicly traded on the Tokyo Stock Exchange (collectively "GCA" or the "Firm"). GCA provides strategic merger and acquisition, capital markets, and private funds advisory services to growth companies and market leaders. GCA Advisors, LLC is headquartered in San Francisco, California and was previously known as GCA Savvian Corporation. GCA Advisors, LLC employs over 80 employees in the United States and generated in excess of $60,000,000 in revenue during 2016, representing nearly 40% of all worldwide revenues of GCA. GCA Advisors, LLC is a Delaware LLC with its principal place of business in California. GCA Advisors, LLC is wholly owned by GCA Savvian, Inc., a Delaware corporation with its principal place of business in California. GCA Corporation is a Japanese corporation with its principal place of business in Tokyo, Japan.

Zoller began her career as a corporate attorney then successfully transitioned to private equity finance after being recruited by one of her corporate contacts. By 2008, Zoller was recruited as a Director by UBS's Private Funds Group — one of the largest global private placement agent groups in the world — and then promoted to Executive Director of the Private Funds Group. Through her legal and private equity work, Zoller developed a stellar reputation both for her depth of knowledge of the industry and for her business skill and perseverance in matching investors with potential investment opportunities.

In the first half of 2013, Zoller had been exploring a number of employment opportunities in private equity when, at the recommendation of a friend and business associate, she met with Hofeditz.

Hofeditz had left his employment at Probitas Funds Group because he was frustrated at what he told Zoller was his lack of control of the business and upside potential. In his time at Probitas, Hofeditz had forged close friendships with two of his male colleagues: Jonathan Jameson and Reidan Cruz. Messrs. Jameson and Cruz declined, however, to partner with Hofeditz to start a private funds group because they were unwilling to take the financial and career risks of building a new business. Instead, Jameson and Cruz preferred to remain employed at established firms with guaranteed earnings. Jameson and Cruz were not willing to put in the work or take the risk necessary to build a new business.

Date Filed: August 13, 2019

With his friends Jameson and Cruz unwilling or unable to partner with him on a new venture, Hofeditz pursued Zoller and asked her to partner with him to build the new business.  After meetings and discussions with Hofeditz about the proposed joint venture, Zoller rejected a then pending lucrative job offer as a Managing Director and placement agent with an established firm, and agreed to join Hofeditz to start a private funds group together.

Hofeditz repeatedly promised Zoller that the two would be partners.  The plan was for each to draw on their business networks and devote "sweat equity," without any immediate financial reward, to build a pipeline of business "deals" to convince an established finance company to hire them and host their private funds business venture.  They agreed Zoller would focus on business development, operations, and logistics and Hofeditz would primarily lead the search for a platform to launch their venture.

Zoller and Hofeditz then refined and shopped a business plan for a new group and lined up deals.  Consistent with their plan, Zoller sourced two of the three deals while Hofeditz met with suitors, including GCA, to present Zoller and Hofeditz's successful business development and multi-year business plan.  As a result of Zoller's and Hofeditz's efforts, GCA agreed to host the joint venture.  Consistent with their status as founding partners, GCA hired both Zoller and Hofeditz as Managing Directors with what Hofeditz led Zoller to believe were identical employment contracts, with the exception of specific reimbursements that Zoller agreed would be paid to Hofeditz.

Although GCA boasted then, and now, of its commitment to diversity, the truth is that the Firm has no interest in supporting women.  Zoller was hired as GCA's first and only female Managing Director, and remained the only female US Managing Director at the Firm throughout her GCA tenure. GCA's executive and management committees were and are exclusively male.  GCA is a male-dominated organization with a fraternity-like boys' club culture that has a standard operating procedure hostile to professional women.  For example, Zoller's first meeting with GCA was held at an exclusive all-men's club that required women to enter through the back door.

In recognition of the sweat equity Zoller had invested in the business prior to her hire, and her essential role as partner and co-founder of the venture, GCA promised Zoller in her employment contract:  (a) an initial annual salary for 2014 and 2015 of $250,000, to be increased to $300,000 once certain revenue goals were met (which occurred by the end of 2015); (b) profit sharing in 2014 and 2015 based on a bonus pool consisting of 45% of group profits, shared equally among all Managing Directors; (c) an equal share with other Managing Directors of 40% of group profits

Date Filed: August 13, 2019

in 2016 and thereafter; and (d) guaranteed payments for deals originated during her employment should GCA exit the business or terminate Ms. Zoller without cause.

Critically, and consistent with her pre-GCA role as co-founder of the Private Funds Group, GCA agreed (in Section 4.C of the Employment Agreement) that if GCA closed their business or if Zoller was terminated for any reason other than for cause, she would receive "revenues collected by the Company from fund formation engagements commenced during your employment that have not already been distributed to you . . ."  In other words, if GCA terminated Zoller for any reason other than for "cause," she would continue receiving revenue from the Private Funds Group after her termination.  These payments guaranteed Zoller her per capita share on an equal basis with Hofeditz and served as security for the partners' sweat equity. Zoller will refer to these contractually required payments as "Post-Termination Equity Payments."

Looking forward to reaping the rewards of her joint venture with Hofeditz and willing to continue to invest in the business, Zoller devoted enormous time and energy to developing and securing a pipeline of substantial investment and placement opportunities that would generate an ongoing income stream for GCA.  By the end of 2014, the joint venture was poised to bring Zoller and Hofeditz substantial returns on their investments.

By late 2014, as a result of Hofeditz and Zoller's hard work, the Private Funds Group's risk of loss was substantially eliminated, and Hofeditz sought to add his friend Jameson as a third Managing Director of the Private Funds Group.  Based on Hofeditz's assurance that she would not lose salary or equity, Zoller agreed to accept Jameson as a third Managing Director.

In mid-2015, Hofeditz, Jameson, and Zoller met in San Francisco.  Hofeditz and Jameson informed Zoller that Cruz was ready to join the team.  Hofeditz and Jameson told Zoller that the three existing Managing Directors would each be required to take a temporary pay cut of $50,000, but claimed that adding Cruz would allow the team to expand the business and, in the long term, increase earnings for the entire team.  Zoller relied on these representations, and that all three were taking a $50,000 pay cut as an investment in the business, and reluctantly agreed to Cruz's hiring and a reduction in her salary, viewing it as her continued investment into the business. These representations were false.  Hofeditz and Jameson did not take a pay cut, and each was paid substantially more compensation than Zoller in 2015.

Once GCA hired Cruz, the Probitas "boys band" was back together.  With a successful future in sight for the Private Funds Group, Defendants began a campaign to force Zoller out of the business and take her share of the equity and earnings.  Hofeditz was openly hostile to Zoller and attempted to discredit her work

-4-

Date Filed: August 13, 2019

and reputation.  For example, Zoller learned that during a secret trip by Hofeditz to Chicago, he drunkenly disclosed confidential information to a prospective client and investor in a public bar.  Hofeditz boasted that he had forced Zoller to take a pay cut and that she was the only Managing Director not receiving a profit-sharing bonus. Hofeditz described Zoller not in a professional business capacity or based on her achievements but as a woman who looked "trashy" and "slutty" and wore too much makeup.  Hofeditz even complained to the prospective client and investor about the color of Zoller's lipstick.

Hofeditz openly, and increasingly, displayed his disrespect for other professional women.  Hofeditz would describe female industry professionals as sexual objects or demean them as incompetent.  He told Zoller one of her female colleagues was "hot" and looked "like a lot of fun" and asked Zoller to have her meet his group at a club in Vegas during a conference.  Hofeditz complained that Zoller was wasting her time by networking with prestigious professional women's groups and successful women in business, even though her efforts generated business and revenue.  Relying on stereotypes rather than actual experience with women business leaders, Hofeditz demeaned and belittled successful female professionals and leaders, labelling them as incompetent and incapable of making decisions.  Hofeditz regularly spoke about women in demeaning and prototypically sexist language, including by calling Zoller and other women "too nice" and demanding they "be more aggressive."

With the band of Probitas men back together, they further undermined and marginalized Zoller.  Among other things, they excluded Zoller from meetings, important information, and business and client opportunities generated from her own contacts and hard work. While Hofeditz advocated for Zoller to "be a team player" and introduce her network and clients to the male Managing Directors, Defendants concealed from Zoller the process to bring in a new client. Hofeditz similarly inserted himself into business Zoller developed and sought credit for her work in front of clients, or sought to give Jameson and Cruz credit for the work Zoller had done. Hofeditz also marginalized Zoller's role by insisting he, Jameson, or Cruz, but not Zoller, cover meetings under the guise of cost savings.  Zoller later learned that Hofeditz allowed Jameson to travel a longer distance to cover a meeting Hofeditz had asked Zoller not to attend.

Defendants undermined and failed to treat Zoller as an equal in other ways as well. For example, in May 2016, Hofeditz, Jameson, and Cruz interviewed and then hired a mid-level analyst for the Private Funds Group.  Although she was Managing Director and co-founder of the Private Funds Group, Zoller was excluded from the interview process and was only notified of the hiring after the fact. Zoller had been involved in all hiring decisions for the Private Funds Group before Cruz joined the team.

-5-

*Complaint – DFEH No. 201908-07199813*

Nonetheless, Zoller continued to do her job effectively, making contacts and sourcing deals that brought in substantial revenue to the Private Funds Group. Neither Hofeditz nor anyone else at GCA raised concerns about her work performance or her contribution to the Private Funds Group's bottom line.

With about a day's notice, Hofeditz asked to meet with Zoller in his hotel lobby on July 20, 2016, while in Chicago on business. During the brief meeting, Hofeditz abruptly fired Zoller "for overhead reasons." Hofeditz made no mention of any concerns with her work, nor could he, as Zoller had performed well by any objective measure and received positive feedback. Indeed, while it was GCA's practice to formally notify employees of any performance issues or deficiencies, with the involvement of Human Resources, and to provide employees an opportunity to address those issues prior to taking any action regarding their employment, Zoller's termination was without notice and in disregard of her strong performance. Equally unprecedented was that Hofeditz terminated Zoller, a Managing Director and co-founder of the Private Funds Group, in this manner.

At the July 20, 2016 meeting, Hofeditz gave Zoller a severance agreement and expected her to immediately sign the agreement. Hofeditz was stunned when Zoller left the meeting, unsigned document in hand. The GCA severance agreement was plainly designed to deprive Zoller of her contractual and civil rights. It provided only two months' pay at her then-reduced base compensation and required a broad general release of all possible claims against GCA, including not only claims for gender discrimination but also Zoller's contractual right to the Post-Termination Equity Payments. Clearly, Hofeditz did not write the severance agreement himself but was aided by GCA's legal and/or Human Resources departments, neither of which gave Zoller the benefit of a discussion. In a flagrant breach of the Employment Agreement and an obvious attempt to coerce a general release of valid legal claims, Defendants have refused to pay Zoller the compensation she is due under the explicit terms of the Employment Agreement.

After Zoller rejected Defendants' attempt to pressure her to unwittingly release her contractual rights and other legal claims, Defendants engaged in a vicious and unlawful campaign to extort Zoller and force her to sign the release documents.

At the time of Zoller's termination, Defendant Daniel Veatch was the Chief Compliance Officer, Chief Financial Officer, and a Managing Director of GCA. In this role, Veatch had fiduciary duties and was tasked with ensuring adherence to governing laws and regulations, including the rules of the Financial Industry Regulatory Authority ("FINRA"), the industry's self-regulating body. GCA is and was at all relevant times a member of FINRA.

When an employee registered with FINRA stops working for a FINRA employer, the employer is required to file with FINRA a form known as a "U5."  Among other things, that form requires the employer to state the "reason for termination" and to provide a brief explanation of certain employee departures.  The U5 is available to all employers who are members of FINRA — essentially the entire financial industry in the United States.  Thus, as Defendants and Zoller were aware, the content of her U5 would have a dramatic impact on her future job prospects.  As Defendants knew, when a U5 indicates that an employee was terminated, particularly for job performance, it can and often does end the employee's career in the financial industry.  Firms are often reluctant to hire employees who are deemed to be poor performers and/or who are terminated by their employers.  On July 22, 2016, Veatch (who prior to this time had been on friendly terms with Zoller) sent Zoller a text message, expressing that he was "very sorry to hear the news" that she had been terminated.  This began a text exchange and series of voicemails that extended well into August.

Although the tone of Veatch's first few text messages was empathetic and consistent with their friendship, Veatch's messages took a darker turn within days.

By July 28, 2016, Defendants and Veatch had launched a campaign to threaten and intimidate Zoller into signing the General Release.

On July 28, 2016, Veatch wrote: "As your friend, I recommend signing your Severance Agreement.  If you sign it then I will log your U5 as a voluntary resignation."  Veatch explained: "a Voluntary Resignation is a perfectly clean U5."  Veatch further shared his view of the negative and dire consequences of not following his advice:  "Anything other than a Voluntary Resignation is a black mark on your record that never goes away."

Veatch concluded the day's discussion on the topic by making crystal clear Defendants' proposed quid pro quo:  a clean, though inaccurate, U5 in exchange for a general release of all claims:  "[I]f you sign your Severance Agreement, I'll file it as a Voluntary Resignation."

On August 2, 2016, Veatch continued the U5 discussion, asking Zoller, "Have you/will you sign your Severance Agreement?"  Zoller responded that her energies were focused on finding employment.

On August 10, 2016, Veatch texted, "I need to file your U5, but I need to understand what you're doing."

Veatch asked again on August 13, 2016, and Zoller replied that she was not yet signing the Severance Agreement but wanted to get her U5 for job search purposes.

-7-
*Complaint – DFEH No. 201908-07199813*

Date Filed: August 13, 2019

Veatch admitted that "[t]he two are tied together.  I would love to file a clean U5, but I cannot if that agreement is not signed."

On August 17, 2016, Veatch resumed his threats:  "1. If you sign your Severance Agreement, I'll push it through (even though it's expired) and file your U5 as a voluntary resignation.  2. If you don't sign that agreement then I'll need to file your U5 a[s] Discharged.  I don't think you want this on your permanent record."

On August 18, 2016, Zoller replied, "I think you should write down what I was told and check the box 'other.'"

Veatch denied her request on August 19, 2016, stating "that's not an option and I need to file your U5 today.  It will be either 'Voluntary' (if you sign the agreement) or 'Discharged.'  If I don't hear from you by noon, it will be the latter."

Veatch was lying when he wrote that it was "not an option" to file a U5 listing the "reason for termination" as "other" and writing down that Zoller was terminated for "overhead."

Zoller replied: "I'm not signing the agreement.  What you're threatening to do is not what I was told by [Hofeditz] and is false.  And in doing so, as you've said, will further harm my 'permanent record.'  I trust you will do what is right."  Zoller also made it clear that even Hofeditz's stated reason of overhead was not the true reason and advised that she would explain to Veatch at a later date the reason she was terminated.

Defendants filed Zoller's U5 later that day with the termination status of "discharged" and with the false explanation that Zoller "[d]id not meet the expectations of the role." Defendants understood that, based on the common understanding in the financial industry, other firms would understand the false statement that Zoller "[d]id not meet the expectations of the role" as meaning that Zoller did not meet her financial goals or bring in sufficient revenue or, worse, had engaged in wrongdoing.  Defendants knew that the statement that Zoller "did not meet the expectations of the role" was false.  Defendants knew their threat to ruin Zoller's career if she did not sign the release, which Defendants then carried out, was not only unlawful but also violated FINRA and SEC regulations.

In the wake of Zoller's termination, GCA, Hofeditz, Jameson, and Cruz have continued to profit from the business that Zoller sourced for the firm through her contacts, skills, and sacrifice, and the resulting track record of GCA's Private Funds Group, which they continue to market to win new business.

-8-

Date Filed: August 13, 2019

In addition to paying themselves higher base salaries than Zoller's (fraudulently reduced) salary, Hofeditz, Jameson, and Cruz have also paid themselves lavish bonuses after her departure, which were inflated because they did not have to share profits with the woman who took the risk and put in the effort to build their business from scratch.  In addition, GCA, Hofeditz, Jameson, and Cruz have pocketed the Post-Termination Payments that they indisputably owe Zoller under her Employment Agreement.

While Defendants have continued to profit from Zoller's investment and work, including the business and goodwill she developed for GCA, Zoller's career has been irreparably damaged.

As a result of her unlawful termination and Defendants' false and defamatory U5, Zoller has been unable to obtain comparable employment since GCA terminated her.  In addition, she has not received the Post-Termination Equity Payments she is contractually owed.  Further, the Private Funds Group's revenues continue to increase, in many cases based on deals that she sourced and relationships she developed, but Zoller has been denied the benefits of the venture she and Hofeditz built.

As a result of Defendants' unlawful conduct, Zoller has lost substantial income, suffered emotional distress, and her career and reputation have been irreparably harmed, among other losses.

Defendants' unlawful conduct was intentional and in blatant disregard of Zoller's legal and civil rights and warrants imposition of liquidated and punitive damages.

Before Zoller filed suit, the parties entered into a standstill agreement tolling the relevant statutes of limitations. As a result, Zoller's claims are timely filed.

As set forth above, GCA paid Zoller lower wages than male employees due to her sex, terminated her employment, refused to pay her Post-Termination Equity Payments because it demanded a General Release of discrimination claims, submitted a False Form U5 and otherwise discriminated against her in the terms and conditions of her employment due to her sex. In doing so, GCA engaged in unlawful sex discrimination in violation of Government Code Section 12940(a) and Title VII of the Civil Rights Act of 1964.

VERIFICATION

I, **Dylan Cowart**, am the **Attorney** in the above-entitled complaint.  I have read the foregoing complaint and know the contents thereof.  The matters alleged are based on information and belief, which I believe to be true.

On August 13, 2019, I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

**Oakland, California**

-10-
*Complaint – DFEH No. 201908-07199813*

Date Filed: August 13, 2019

# EXHIBIT B

GFI_854615_6_GCA Savvian - Fund Manager Offer Letter - Shannon (1)
3/9/14 12:07 PM

March 7, 2014

Shannon Zoller
REDACTED

Dear Shannon:

I am pleased to offer you a position with GCA Savvian, Inc. (the "Company") on the terms and conditions set forth in this Letter Agreement (this "Agreement"):

1.  <u>Employment</u>.  You will hold the title of Managing Director of the Company or such other title as the Company may designate from time to time.

2.  <u>Duties</u>.  You are expected to work as a Managing Director of the GCA Savvian Private Funds Group (the "Group"),  reporting to the Executive Committee of the Company and shall have such job responsibilities as the Executive Committee, or its designee, shall determine from time to time.  You agree to devote substantially all of your time, energy and ability to the business of the Company.  You also agree to comply with the Company's Compliance and Supervisory Procedures Manual, including with respect to your trades and investments.

3.  <u>Commencement Date</u>.  Your employment will commence on March 10, 2014, or another mutually agreeable date.

4.  <u>Compensation</u>.

    A.  <u>Base Compensation</u>.   During calendar years 2014 and 2015, the Company will pay you annual base compensation at the rate of two hundred fifty thousand dollars ($250,000) until either: (1) the Company's Revolution Growth Fund (the "Fund") closes in excess of four hundred fifty million dollars ($450,000,000); or (2) the Fund yields cumulative booked and collected revenue greater than or equal to two million dollars ($2,000,000), as determined by the Company's Executive Committee in its discretion based on Generally Accepted Accounting Principles ("GAAP").  After either of the conditions in the preceding sentence is met (and for future years), the Company will pay you annual base compensation of three hundred thousand dollars ($300,000).  Base compensation payments under this Paragraph will be payable in equal installments in accordance with the Company's customary practices.  The Company may, in its sole discretion, modify your base compensation upon two weeks' prior notice, or such shorter period as shall be reasonably practicable.

    B.  <u>Net Profit Sharing</u>.  For calendar years 2014 and 2015, you will also be eligible to participate in Net Profit Sharing.  Under the Net Profit Sharing program, the Managing Directors of the Group shall be eligible to participate in a bonus pool consisting of forty-five percent (45%) of the total revenues actually collected (rather than booked) by the Company from Group engagements during the applicable calendar year less: (1) salary, bonus, and benefit costs of all dedicated employees in the Group at the Vice President, Director, and Managing Director levels; (2) direct information technology costs and services that are not part of the Company's standard information technology package provided to Managing Directors; (3) non-reimbursed travel expenses; (4) branch office expenses for all dedicated employees in the Group; and (5)

any other expenses incurred that are specific and directly related to Fund business, such as conferences and marketing. (The net total of all of the foregoing in the prior sentence shall be referred to as the "Net Contribution.") The total amount of the Net Profit Sharing payment for all Managing Directors in the Group will be determined by the Executive Committee in its discretion in each January following the end of each calendar year. The portion of the Total Net Profit Sharing payment that is paid to you shall be determined by the Executive Committee. Payment will be made in any event by the end of each February for the prior calendar year.

Commencing with calendar year 2016 and thereafter, the Company will pay you either of the following, selected collectively by the Managing Directors of the Group in their sole discretion: (1) forty percent (40%) of the Net Contribution for the applicable year (determined under the same methodology and with the same payments dates as outlined above); or (2) a bonus paid in accordance with the Company's bonus program applicable to the Company's non-Group Managing Directors. In the event the Managing Directors of the Group collectively opt out of the Net Profit Sharing program, the Group, including its Managing Directors, will not be eligible to rejoin the Net Profit Sharing program in future years. All payments under the Company's bonus program will be made in accordance with the terms of such program.

C.    Fund Closure.  In the event the Company decides to exit the business of fund formation altogether and/or terminates you other than for Cause (as defined below), the Company will pay you revenues collected by the Company from fund formation engagements commenced during your employment that have not already been distributed to you in an amount equal to your pro rata share (based on the number of Managing Directors of the Group) at forty-five percent (45%) of the Net Contribution during 2014 and 2015 and at, to the extent that the Group Managing Directors have not opted out of the Net Profit Sharing program, forty percent (40%) of the Net Contribution for 2016 and thereafter.  Payments for each year will be calculated using the same methodology and with the same payment dates outlined in Section 4.B. above.

In addition, in the event the Company decides to exit the business of fund formation altogether and/or terminates you other than for Cause: (1) the Company will not claim entitlement to Group engagements that have commenced but not closed; and (2) your obligations to the Company under Section 5 ("Solicitation of Employees") and Section 6 ("Solicitation of Clients") of the attached Confidentiality, Non-Solicitation and Arbitration Agreement between you and the Company will cease upon the end of your employment with the Company.  All other provisions of the aforementioned agreement will remain in effect.

For the purpose of this Section 4.D., "Cause" shall mean: (1) your willful failure to perform the duties and responsibilities of your position; (2) any act of personal dishonesty knowingly taken in connection with your responsibilities as an employee of the Company; (3) your conviction of, or plea of guilty or *nolo contendere* to, a felony; (4) the commission of a willful and knowing act which constitutes gross misconduct with respect to the duties and responsibilities of your position; or (5) a willful breach of a material provision of this Agreement or of the Confidentiality, Non-Solicitation and Arbitration Agreement.

D.    Benefits.  During your employment with the Company, you and/or your

SFI_854615_6_GCA Savvian - Fund Manager Offer Letter - Shannon (1)
3/9/14 12:07 PM

family, as the case may be, will be eligible to receive the same welfare benefits provided by the Company to your peer employees, which currently include medical, dental and vision insurance, in accordance with the terms of the applicable programs.   Specific benefits provided are subject to change.  The Company shall provide you with COBRA coverage as provided by law.

        E.    <u>Expenses</u>.  You shall be entitled to receive prompt reimbursement for all reasonable employment expenses incurred by you in accordance with the policies, practices and procedures as in effect generally with respect to your peer employees in the Company.

        F.    <u>Fringe Benefits</u>.   You shall be entitled to fringe benefits, if any, in accordance with the plans, practices, programs and policies in effect generally with respect to your peer employees in the Company.

        G.    <u>Vacation</u>.   You shall be entitled to vacation in accordance with the Company's plans, policies, programs and practices as described in the Company's Employee Handbook.

        H.    <u>Modification</u>.   The Company reserves the right to modify, suspend or discontinue any and all of the above plans, practices, policies and programs at any time without recourse by you so long as such action is taken generally with respect to other similarly situated peer employees.

5.    <u>Employment At-Will</u>.  Your employment with the Company is for no specified period of time and is "atwill."  As a result, you are free to resign at any time, for any reason or for no reason, and with or without notice. The Company is likewise free to terminate your employment at any time, with or without cause and with or without notice.  Notwithstanding the foregoing, you agree that, in the event of your voluntary resignation, you will give the Company at least two weeks' prior notice if reasonably practicable.

6.    <u>Background Check</u>.   The offer of employment contained in this Agreement is conditioned upon any investigation or check of your background or references undertaken by the Company being satisfactory to the Company, in its sole discretion.  Your employment is also conditioned upon your disclosure to the Company of any and all agreements relating to your prior employment that may affect your eligibility to be employed by the Company or limit the manner in which you may be employed.  You hereby represent that you have disclosed all such agreements to the Company and you hereby represent that no such agreements prevent you from performing all of the duties of your contemplated position with the Company.

7.    <u>Employment Eligibility</u>.  As a condition of your employment, you will be required to provide to the Company documentary evidence of your identity and eligibility for employment in the United States.  Such documentation must be provided to the Company within three (3) business days after your date of hire or your employment will be terminated by the Company.

8.    <u>Compliance</u>.  If you accept this offer of employment with the Company, you agree to abide by the Company's policies, rules and standards. Specifically, you will be required to, and hereby agree to, sign an acknowledgment that you have read and that you understand the Company's rules of conduct which are included in, among other places, the Company's

Employee Handbook and GCA Savvian, Inc.'s Compliance and Supervisory Procedures Manual.

9.     Confidentiality and Non-Solicitation. As a condition of your employment, you are also required to, and hereby agree to, sign prior to the Commencement Date and comply with the Company's Confidentiality, Non-Solicitation and Arbitration Agreement in the form attached hereto as Exhibit A.

10.    Arbitration. In the event of any controversy or claim relating to or arising out of your employment with the Company, the termination of that employment, this Agreement or its enforcement or interpretation, or because of an alleged breach, default, or misrepresentation of any of this Agreement's provisions, you agree that such dispute shall be exclusively settled by final and binding arbitration pursuant to Section 9 of the Confidentiality,  Non-Solicitation and Arbitration Agreement attached hereto as Exhibit A.

11.    Successors. This Agreement is personal to you and shall not, without the prior written consent of the Company, be assignable by you. This Agreement shall inure to the benefit of and be binding upon the Company and its successors and assigns and any such successor or assignee shall be deemed substituted for the Company under the terms of this Agreement for all purposes. As used herein, "successor" and "assignee" shall include any person, firm, corporation or other business entity which at any time, whether by purchase, merger or otherwise, directly or indirectly acquires a majority equity ownership interest in the Company or to which the Company assigns this Agreement by operation of law.

12.    Waiver. No waiver of any breach of any term or provision of this Agreement shall be construed to be, nor shall be, a waiver of any other breach of this Agreement. No waiver shall be binding unless in writing and signed by the party waiving the breach.

13.    Savings Clause. If any provision of this Agreement or the application thereof is held invalid, the invalidity shall not affect other provisions or applications of the Agreement which can be given effect without the invalid provisions or applications and to this end the provisions of this Agreement are declared to be severable.

14.    Complete Agreement. This Agreement and the attached Confidentiality, Non-Solicitation and Arbitration Agreement (and their attachments) constitute and contain the entire agreement and final understanding between the parties concerning your employment with the Company and the other subject matter addressed herein and therein. They are intended by the parties as a complete and exclusive statement of the terms of such agreement. They supersede and replace all prior negotiations and all agreements proposed or otherwise, whether written or oral, concerning the subject matter thereof. Any representation, promise or agreement not specifically included in this Agreement or the attached Confidentiality, Non-Solicitation and Arbitration Agreement (or their attachments) shall not be binding upon or enforceable against either party. This Agreement may not be amended or modified other than by a written agreement signed by you and the Company's Executive Committee.

15.    Governing Law. This Agreement shall be deemed to have been executed and delivered within the State of California, and the rights and obligations of the parties hereunder shall be construed and enforced in accordance with, and governed by, by the laws of the State of California without regard to principles of conflict of laws.

16.    Communications. All notices, requests, demands and other communications hereunder shall be in writing and shall be deemed to have been duly given if delivered or if mailed by registered or certified mail, postage prepaid, addressed to you at 1759 N Wolcott St., Chicago, IL 60622, or addressed to the Company at 150 California Street, San Francisco, California 94111 Attention:  Executive Committee. Either party may change the address at which notice shall be

given by written notice given in the above manner.

17.     Execution.  This Agreement is being executed in one or more counterparts, each of
which shall be deemed an original, but all of which together shall constitute one and the same
instrument.  Photostatic or facsimile copies of such signed counterparts may be used in lieu of the
originals for any purpose.

18.     Legal Counsel.  You recognize that this Agreement is a legally binding contract and
acknowledge and agree that you have had the opportunity to consult with legal counsel of your
choice before signing it.

//

//

To accept the Company's offer of employment, please sign and date this letter in the space
provided below and sign and date the attached Confidentiality, Non-Solicitation and Arbitration
Agreement.  Duplicate originals are enclosed for your records.
We look forward to your favorable reply and to working with you at GCA Savvian, Inc.

Sincerely,
GCA Savvian, Inc.

                                        Mark McInerney
                                        Managing Director

**Agreed and Accepted:**

Signature:   _Shannon Zoller_

Printed Name:  SHANNON ZOLLER  (GOMEZ)

Date:   3. 9. 2014

Enclosures
Duplicate Original Letter
Original and Duplicate Confidentiality, Non-Solicitation and Arbitration Agreement